Wm. Disney, for plaintiff.

Jacob H. Bromwell and M. Ruskin, contra.

---

(Cuyahoga County Court of Common Pleas.)

### ROTINA S. SHELDON v. HIRAM COLE.

*Surface Water.*—According to the common law each land owner must care for his own surface water. According to the civil law the lower land must receive the surface water which flows from the higher land in a state of nature, and the rule of the civil law seems to prevail in Ohio rather than the rule of the common law.

*Same—Effect of cultivation of land on natural flow of surface water.*—The rule in Ohio seems to be that the cultivation of land by ordinary good husbandry, although it may change somewhat the course of the water and concentrate the flow of water at places, is not such a control of the land as gives the neighbor any right to complain. although the flow upon his land may seem more severe and concentrated than it otherwise would be.

*Same—Right of lower owner to erect dam against the flow of surface water onto his land.*—If a land owner has done anything more than good husbandry would justify him in doing in the cultivation of his land, in bringing together larger quan-

tities of surface water, and directing over into his neighbor's land any larger quantities than exist in a state of nature, then such neighbor has his action. But he has no right to erect a dam, notwithstanding the fact that he may have suffered some damage thereby.

*Same—Damages.*—The erection of such a dam or structure, preventing the natural flow of the water is an invasion of the upper land owner's right, and the averment of the fact is in law to aver that the owner of the land so affected was injured, for which he has remedy.

(Decided January Term, 1895.)

HUTCHINS, J. (orally).

The plaintiff and the defendant own adjoining pieces of land in the township of Euclid in his county, which have been put in a state of grape culture, and they have carried on for some years what is known as a vineyard. The issue raised in this case is as to the surface water, and the question to be determined is whether or not, as charged in the petition, in a state of nature the surface water flows from the land of the plaintiff over onto the land of the defendant in a westerly or northwesterly direction; and whether that natural flow in a state of nature has been impeded and interrupted by the erection by the defendant of a dam or embankment along the defendant's east line, the effect of which would be to force back the water upon the property of the plaintiff, to her injury and damage.

Without stopping at this time to read the petition, which is somewhat voluminous, I will say that it claims that the plaintiff was at the time of the grievances complained of in said petition, the owner of the piece of land described in said petition, which land has been, as before stated, subjected to grape culture; and that in a state of nature the water flows westerly or northwesterly from the land of the plaintiff onto and over the land of the defendant, Hiram Cole, which lies west of plaintiff's land; and that condition prevailed in a state of nature till the defendant obstructed this flow by the erection along the defendant's east line of an embankment or dam of sufficient height to keep the water from flowing in that direction, and forcing it back upon the land of the plaintiff. The plaintiff claims that by reason of these conditions her property has been greatly damaged by thus setting back the water by means of this obstruction or dam, said damage amounting to the sum of $2500, as claimed; and that also a portion of her land lying northerly of what is called the "Ridge" that is said to run across the Sheldon land, was overflowed by reason of the water being forced through and over this ridge, which plaintiff claims to be a natural obstruction, resulting in great damage and carrying away earth on the northern side of this ridge.

The defendant in his answer admits that he owns the land adjoining plaintiff described in the petition, and denies everything else in the petition; and by way of second defense and cross-petition he claims that by reason of the way in which the Sheldon vineyard is cultivated, the water was forced back over onto his land to his damage and injury, which was contrary to the natural flow of the surface water by nature.

The plaintiff in her reply to the cause of action set up in defendant's answer and cross-petition denies these allegations.

The questions raised in this case are exceedingly interesting, and are not ordinarily met with; and in fact, it would seem that these questions have not been as fairly and fully met and discussed in the courts of Ohio as in some of our sister states. The following are the conclusions to which I have come as the law of the case:

According to the common law each land owner must care for his own surface water. According to the civil law, the lower land must receive the

surface water which flows from the higher land in a state of nature, and the rule of the civil law seems to prevail in Ohio rather than the rule of the common law. A thorough examination of the authorities convinces me that this application of the civil law rule is not uniform throughout the states in this country; many states in New England at least, and eastern states, and some southern states have adopted the common law rule, while in most of the western states the rule of the civil law prevails, which is a reversal of the common law.

Two or three cases in Ohio may be referred to at this time. I first refer to the case in the 16 Ohio St. 335, Butler v. Peck. The syllabus of that case is as follows: "Where, upon the lands of B. there is a marshy basin from which, in times of high water, a portion of the water contained in the basin overflows its rim and naturally finds its way through a swale to and upon the lands of P., while the remaining portion of the water of the basin has no outlet, and is dissipated by evaporation, B. can not rightfully, by an artificial drain, conduct the water that has no natural outlet, from the basin and along said swale, so as to cause them to flow upon the lands of P. to his damage." The Judge in his decision, quoting from the charge of the court below, says: While each party may avail himself of the natural position and capabilities of his own land, he can not insist upon compelling the other to change places with him; and if you find in this case the facts to be, that there was a pond or basin upon defendant's land which had not an outlet, and in which the waters accumulating remained until evaporated, or that the waters of such pond or basin passed off through another channel, and in a different direction, and in either case the defendant, by the construction of his ditch, has conveyed onto the land of the plaintiff water which would either have remained on the defendant's land until evaporated, or which would have, but for the ditch, passed off by a different channel or water course, the defendant is liable; for he has no right, by the construction of new channels, to throw onto the plaintiff water that would have gone there without. Unless all of the water which now passes through the natural channels on to the plaintiff's land would have passed through the natural channels from the defendant's land on to that of the plaintiff, the plaintiff is entitled to recover. If you should find that the natural outlet of this basin is as the defendant claims, or if you should find that the water did pass out of it in a northwesterly direction, but that it immediately came back upon the land of the plaintiff, at the point where it now does, or substantially so, you will find for the defendant; but if you find that after natural outlets had ceased to carry off the water, there still remained a basin covering several acres on which water stood in the depth of one, two or three inches or more, which would not have passed upon the land of the plaintiff but for this improved channel, the plaintiff is entitled to recover."

Another interesting case where this question is discussed as to the application of this civil law rule is in the 22d Ohio St. 247, Tootle v. Clifton. The syllabus is as follows: "The erection of an embankment upon one's own land, whereby the surface water on the adjoining land of another is prevented from flowing in its natural course, and caused to flow off in a different direction over the land of the latter, is a nuisance for which an action may be maintained without showing any actual damage, and for which nominal damages at least may be recovered." In his opinion in this case the court said: "It is not denied that the period of prescription, in cases of easements and incorporeal rights, is twenty-one years in Ohio; and it is admitted that the period begins to run when a right of action accrues. The single question argued is, whether in a case like the present, as hypothetically put by the court in its charge, there is a right of action.

In other words, the question is, whether the erection of an embankment upon one's own land, whereby the surface water accumulating on the land of another is prevented from flowing in its natural courses, and caused to flow off in a different direction over his land, is an act for which the latter may sustain an action, without showing any actual injury or damage.'' Of course, it goes without saying that the action at bar is one to enjoin the defendant to abate the nuisance in the way of erection of a dam. I read further from the same opinion. ''We answer the question in the affirmative. The act is wrongful. It is an invasion of the plaintiff's right—the right to manage his own farm according to his own notions of fitness and enjoyment, and therefore the law presumes a damage, although it be merely nominal or ideal. To aver the fact of the wrongful structure, and its effect in preventing the natural flow of the water, is in law to aver that the owner of the land so affected thereby was injured. This is the general law applicable to cases of nuisance. Wherever one's right is actually invaded, he has his remedy irrespective of the amount or actuality of the damage. Then he quotes several authorities on that question.

Another case in point here is that in the 44 Ohio St. 279; I refer to these together because they bear upon different phases of the question as we proceed to discuss them. The original action in the case in the 44 Ohio St. was brought by the plaintiff to recover of the defendants damages to his lands caused by the construction of an embankment by them on their own lands to prevent the same from being overflowed and injured by the water of the Muskingum river, on which the lands of the parties are situated. The Judge says: ''The question in this case is, whether the owner of land upon a natural stream of water, so situate that in times of flood it is overflowed by the superabundant water, may, to benefit his own lands, construct an embankment thereon, the natural and probable consequence of which must be, and is, at times of ordinary floods, to cause the swollen current to overflow, erode and destroy the lands of another proprietor thereon. We have so stated the question in this case, because, as we think, the question as to surface water is not involved in it.''

''The premises of the parties are situate upon a bend of the Muskingum river, those of the plaintiff being upon the exterior and those of the defendants upon the interior of the bend; the included lands being divided between Rambo on the one side and the Littles on the other by a line running a little east of south. It is upon this line, beginning at a point about 180 feet south of low water mark on the interior bend of the river, and extending some 2,900 feet thereon, that the embankment has been constructed by the defendants. It serves to protect the lands included by the bend from the violence of the current that flows across the same when the river is swollen by a flood, and was constructed by the united labors and expense of the defendants for their mutual benefit. It necessarily acts as a partial dam to the current when the river is swollen by floods; and, as averred, causes the flood water to flow over and upon the lands of the plaintiff with destructive violence, doing him great damage at such times.

''It is difficult to see upon what principle the flood waters of a river can be likened to surface water. When it is said that a river is out of its banks, no more is implied than that its volume then exceeds what it ordinarily is. Whether high or low, the entire volume at any time consitutes the waters of the river at such time; and the land over which its current flows must be regarded as its channel, so that when swollen by rains and melting snows, it extends and flows over the bottom along its course; that is its flood channel, as when by droughts it is reduced to its minimun, it is then in its low water channel.''

Surface water is that which is diffused over the surface of the ground,

derived from falling rains and melting snows, and continues to be such until it reaches some well defined channel in which it is accustomed to, and does flow with other waters, whether derived from the surface or springs; and it then becomes the running water of a stream, and ceases to be surface water." He quotes from the 16th Ohio St., and the 22nd Ohio St., and then says further on: "The civil law acts upon the maxim that water is descendible by nature and that its usual flow should not be interfered with, so that its burden, if it be one, should be borne by the land where it naturally flows, rather than by land where it can only be made to flow by artifical means. The common law does not recognize this principle as to surface water, but permits any one to protect his own premises from it as he may choose to do, without becoming liable to others injured thereby; or, more properly, it does not regard it as an injury to do so, whatever inconvenience or loss may result to others therefrom. It is not necessary, as we have said, to discuss the merits of either system in this case as the injury complained of does not arise from an interference with the flow of surface water."

I have carefully reviewed the testimony of the witnesses of this case as to the natural flow of the surface water over this land in a state of nature, back of the time when man had changed, or could have changed by the methods of cultivation, the natural flow of water over and upon these lands. I was particularly impressed with the testimony of the old gentleman Mr. Weisbarth. He was one of the early tenants of the Sheldon land, long before that or the Cole land were cultivated for grape purposes, and when it was essentially in a state of nature. By reference to his testimony, and he appears to have been entirely without interest in this case and without prejudice or feeling—and when I say that, I may say he was an exceptional witness in that regard, because I never heard a case of this character where there was more feeling manifested by witnesses and parties to the suit—I find that he had a vivid recollection of the old land marks and the conditions in those early days; and by his testimony I am persuaded beyond any question that in a state of nature there was a natural flow of water from at least a portion of the Sheldon land lying north of what is called the sand knoll, up near the north alley way—as it is called in the testimony—and land lying south of that and east, and the line between Cole and the plaintiff. I am satisfied that in a state of nature there was a natural trend of the surface water in a westerly or northwesterly direction over the land of Sheldon over the line between Sheldon and Cole, passing along over Cole's land and along over his neighbor's till it reached what is called Euclid Creek channel.

The testimony of Mr. Bardwell, a gentleman who impressed me as being a man of exceptional candor and intelligence and who has lived in that community for many years, confirmed substantially the testimony of Mr. Weisbarth as to the flow of water in a state of nature.

Then I say, I am satisfied from the balance of the testimony of the witnesses who are best qualified to judge of these conditions in a state of nature, that the water flowed from the Sheldon land, or a portion of the same at least, over onto the Cole land in a northwesterly direction. I am also satisfied that the lay of the land as indicated by the levels established by the surveyors, confirms this testimony, especially with reference to the more recent surveys.

Now, it seems, bearing upon this question there is a crucial test. In these later years these lands have been devoted to the cultivation of grapes. Mr. Sheldon has been in the habit of cultivating from north to south over his land, or northerly and southerly. Plowing in that direction he would plow up to what is called his south alley way, a strip that was left open

for the purpose of sending down wagons and taking away fruit in baskets; and then the plough would be taken out and put in again, and plowed continuously north till it struck the north alley way, or this knoll or sand hill at that point, and from that to what is called Moses' land on the north. Mr. Cole ploughed his land in a different direction, so that the condition of the surface of the land as exhibited to us to-day and as the witnesses testified to it as in the modern condition, is different from what it was in a state of nature before this cultivation was in vogue. Therefore it is found to be somewhat difficult, perhaps, to ascertain by what we call the levels of surveyors, the real situation of these various points in these pieces of land. But I am satisfied, taking the whole survey as I did, through my examination of notes by the surveyors, that they confirmed by their testimony the fact that that was the trend of the lay of the land.

Now, as a test, we have a circumstance by which considerable light is thrown upon the true condition. In September, 1892, there was a very heavy fall of water. After that severe downfall of rain, the water, which was standing in places on Sheldon's land, ran through the alleged embankment on Cole's east line after Mr. Sheldon made a small opening with his foot, and from there it found its way to a northwesterly direction through and over Cole's land and on to his neighbor, who then and there traced the water back to the opening thus made by Sheldon, indicating the natural flow of the water in that direction beyond a question. The evidence is that Shedon was standing there with his hired man after this unusual downfall of water, and finding the water standing back upon his land and among his grape vines, put his foot into the soil just enough to open that, which would ordinarily be opened by the pressure of the foot, and the water began at once to find its way out through that opening, cutting its way larger as the flow became more rapid, till it went in a northwesterly direction following the line of the old ditch, running down onto the neighbors and playing mischief, and attracting the attention of the neighbors, and they at once came out and traced that stream back, and found it passed over that line which is indicated by Sheldon's testimony, and in a short time the gorge was relieved and the water flowed on.

The plaintiff alleges that this condition of affairs, this natural trend of the water in a state of nature, was impeded and interfered with by the erection by Cole of an embankment or dam extending some 64 feet north of the north alley way on Mrs. Sheldon's land and on Cole's east line, and 50 feet south of said north alley way, along the west line of Sheldon's land; that soil was brought in there and piled up, and this embankment made of sufficient height to obstruct this natural flow of surface water, and turn it off into the dead furrows in Sheldon's land, forcing it back on Sheldon in one direction, and in another direction towards Moses' land. Evidence is conclusive and Cole admits that he did change the conditions of that east line and brought dirt into here and ploughed in there. He says—and the impression he conveyed by his testimony (and he is as fair as any other witness would be with like interest) is—that he did interfere with the condition of that line, but that it was only ploughed up in the process of cultivation that was carried on, and that he didn't intend to make any embankment. But the proof is overwhelming that by some process an embankment was made which raised the east line of Cole's land several inches above its natural condition, and that just as soon as that bank was removed or an opening made in it, the water sought its natural outlet from the portion of Sheldon's land lying south of this sand knoll, over into Cole's land, where it is claimed by the old gentleman and by others it naturally flowed in a state of nature. So I am bound to hold that there was an obstruction, call it an embankment or dam, that forced that water back onto Sheldon and in that direction which was not intended by nature.

It is claimed by Cole that the method of cultivation employed by Sheldon, of his vineyard, was such as to force the water in larger volumes along his north and south plowing, and rose between the hills of grapes up to this sand knoll, or to the 30th row from the line between these parties, and that it resulted in the water being gathered into these rows and forced down to this embankment, and finding its obstruction there it was turned towards Cole, and came in such large volume and force as to bring the water unnaturally and with more force than was justified over onto the land of Cole; and that therefore he was justified in erecting his embankment and defeating the effort of Sheldon to thus force the water upon him, and he therefore claims there should be no restraining order granted because of his right thus to interfere with this matter.

It is true, the method of cultivation by Sheldon was such as to accummulate more water along that place than would have been natural in a course of nature. But I am not able to find that he did more than a man has a right to do in good husbandry in cultivating his land. I apprehend the rule in Ohio to be that the cultivation of land by ordinarily good husbandry, although it may change somewhat the course of the water and concentrate the flow of water at places, is not such a control of the land as gives the neighbor any right to complain, although the flow upon his land may seem more severe and concentrated than it otherwise would be. I find a decision to this effect in the 26th Ohio St.

If Sheldon has done anything more than good husbandry would justify him in doing in the cultivation of his land, in bringing together larger quantities of surface water, and directing over onto Cole any larger quantities than exists in a state of nature, then I would say Cole has his action. But he has no right to erect a dam, notwithstanding the fact that he may have suffered some damage thereby.

I have indicated my opinion in this case, and there are a great many things I might have referred to. It is my conclusion, and a decree will be made, requiring the defendant to abate the nuisance created by the erection of the embankment or dam on his east line, by leveling to the ground or removing said embankment to the level ground which it was before the embankment was made, about the level of the west line of the Sheldon land.

The plaintiff is awarded in the way of damages—what? The court must be careful to see that no injustice is done here. I have held that in erecting that dam he violated the rights of the plaintiff, and that it must be abated as a nuisance. But the testimony on the question of damages is very vague and unsatisfactory. I would rather err on the side of the defendant in this respect than on the side of the plaintiff. I would rather the damages would be too little than too much. I am disposed to think that in the method employed by Sheldon of cultivating his land, that in this opening between these furows a large amount of water will stand by reason of its confinement; that that will and does stand more or less, and whatever injuries or damages he has suffered by interference to the growth of his vines has been in part due to his own method of cultivation. Except in that time of the great flood and at another time when there was considerable flow of water, I don't recall any serious backing up of water so as to injure Sheldon's vines incident to the erection of this dam. Therefore I hold that his damages have not been great. I have concluded that in this case I will not go to the full length justified on the measure of damages, and will simply say that the damage which plaintiff recovers against the defendant is the nominal sum of $25.00, and not $2,500.

C. N. Sheldon, Esq., E. J. Pinney, Esq., for plaintiff.

Messrs. Wilcox & Collister, for defendant.